## In re LURA MARIE CROCKETT.

**Kansas City Court of Appeals, November 27, 1916.**

1. **HABEAS CORPUS: Parent and Child: Custody and Control.** This is an original proceeding by *habeas corpus* begun by the father, the petitioner, against the respondents, who were the grandparents of his infant daughter, and under whose control she has been for several years. The question presented was whether the true welfare of the child will be promoted by taking her from her grandparents, who reared her since infancy, and the death of her mother, and to whom she is strongly attached and give her to her father who has married a second time. *Held*, that the peremptory writ is denied and the infant is awarded to the custody of respondents.

2. ————: ————: ————. The rights of neither parent should be disregarded or overlooked yet the welfare of the child is superior to the claim of either parent.

3. ————: ————: ————. As between father and grandparents of an infant, the father being the natural guardian of his child, is entitled to the custody of its person "unless it is made manifest to the court that the father for reason, is unfit or incompetent to take charge of it, or unless the welfare of the child itself, for some special or extraordinary reason, demands a different disposition of it at the hands of the court."

Original proceeding in *Habeas Corpus*.
WRIT DENIED.

*Virgil V. Hugg* and *Williams & Williams* for petitioner.

*John A. Rich, Com. P. Storts* and *Duggins & Duggins* for respondents.

JOHNSON, J.—This is an original proceeding by *habeas corpus* begun July 2, 1915, by George R. Crockett of Marshall to secure the custody of his infant daughter, Lura Marie. The respondents are the maternal grandparents of the child who has been a member of their family since her birth which occurred at respondents' home in Slater on January 28, 1908. The pleadings are

voluminous and recite the details of the controversy with particularity, but the parties concede in their brief and argument that the principal question at issue is whether the true welfare of the child will be promoted by taking her from her grandparents to whom she is strongly attached and giving her to her father.

Our special commissioner heard and reported the evidence and submitted conclusions of fact and law in which he reached the final conclusion that the petitioner "is a fit and competent person to take charge of his child and that no special or extraordinary reason has been shown by respondents why he should not have the custody and control of her and that it would be for her best interest and welfare that she be surrendered by respondents." Exceptions were filed to the report and the case was argued orally, the interested parties being present at the argument.

The material facts of the case are as follows: The petitioner resides in Marshall where he is engaged in the real estate business. He is successful in business, belongs to one of the oldest and most highly respected families in the community and is a young man of high character. By his own efforts he has accumulated an estate of more than $4000 and has a yearly income from his business of $2000. There is no question of his ability to support and rear his child in a proper and suitable manner. His parents live at Marshall, have reared three children and his father's wealth is estimated at $40,000. The petitioner and Myrtle, the only daughter of respondents, were married at respondents' home in Slater, April 17, 1907, and the young couple made their home in Marshall where the petitioner was engaged in the grocery business. They purchased and furnished a residence and kept house until the Christmas holidays when they went to Slater to visit respondents. The young wife was *enceinte* and in poor health. The couple were well mated and happy, the relations between petitioner and respondents were of an unusually affectionate character, and the relations between respondents and the parents of the petitioner were most cordial.

The only thing that cast a shadow over the happiness of the family was the condition of Myrtle's health which grew worse during the holiday visit and became so serious that she could not return to her home in Marshall. After the birth of her child her health did not permanently improve but steadily grew worse. She became afflicted with tuberculosis and died at St. Louis, September 21, 1909. She had been taken to that city for medical treatment and the expenses of her last sickness and burial were great and in large part were defrayed by the respondent grandfather who is a man of large means, his wealth being estimated at more than $50,000. He had loaned the petitioner $3300 to pay on the purchase price of the residence in Marshall and voluntarily assumed the burden of sharing the expenses of his daughter's last sickness and burial. There is no suggestion in the evidence that the petitioner, whose ready money was exhausted, tried to shirk any duty or was lacking in devotion to his wife. The conduct of all the parties was exemplary and most creditable.

The care of the infant daughter from its birth devolved upon the grandmother and the incidental burdens were unusually onerous. The child was prematurely born, weighed only four and one-half pounds and was frail and delicate. Before its birth Myrtle said to her mother, "Mamma in case I don't get well I want you to get my baby. I feel that in your years after you have raised yours, it is asking a good deal, but I know your ways and your ideals and you know how to raise a baby." Before leaving for St. Louis Myrtle, having a premonition of approaching death, repeated this desire to her mother and again, just before her death. Petitioner did not know of these requests but his own opinion and desire were the same. His parents would have gladly assumed the care of the orphan but agreed with him that respondents who, of course, were anxious to keep the child, were entitled to that honor—as they all esteemed it to be. The discussion of this tender subject ended in the father saying to the maternal grandmother, "I will leave her here, all I ask is that you raise her like Myrtle;

she could not have a better home, I don't think it could be improved on.''

The family of respondents thereafter consisted of themselves and their grandchild whom they took into their lives and hearts as their own daughter. A grown son who has his own home is their only living child and the grandfather in his will has made his grandchild an equal heir with his own son. The petitioner continued to live at Marshall, which is about twelve miles from Slater, the two cities being connected by railroad, and during the first three years following the death of his wife, his custom was to make week-end visits at respondents' home where he was always affectionately received. He contributed nothing to the support of his child, not from any disinclination, but because respondents were abundantly able and willing to bear that small burden themselves. Father and child loved each other and both looked forward to the weekly visits but naturally the child's strongest attachment was for her grandparents. She is not robust, is nervous, physically resembles her mother and has required the services of a physician many times for childish ailments.

On October 9, 1913, the petitioner married Mary Graham, a young widow, at Mexico, after a year's courtship during which his Sunday visits alternated between the homes of respondents and Mrs. Graham. He first mentioned to respondents the subject of his approaching marriage in a letter dated October 1, 1913, in which he said, ''I fully intended to talk it over with both of you for the past several weeks but have failed to do so. It is a most serious question with me and especially so when I am in the presence of my darling little girl and in Myrtle's home. I am taking this step not unthoughtedly, but after thinking it over a great deal, and after seeking Divine guidance . . . I have talked frankly with her (Mrs. Graham) and have told her no one could fill Myrtle's place in my life . . . She understands I worship Lura Marie . . . She will be a tender-hearted, true-hearted stepmother. If I were not sure of this one thing I could not take this step. . . .

While this step is bound to touch a tender chord in each of your hearts, yet I do trust I am not doing something that meets with your disapproval. I feel toward you almost the same as toward my own father and mother and I shall always feel the same toward you as I do now. I wish I knew how to express my appreciation of all you have done for me and for Lura Marie but words are insufficient. I want you to talk this matter over with Lura Marie and explain to her the best you can, for her future happiness and yours and mine shall depend very largely on the way she and Mary feel toward each other.''

On returning from his wedding trip, petitioner wrote the grandmother from Marshall, saying, ''I am getting so anxious to see all of you. Want you to meet Mary and she wants to know you. I feel sure that after you know her, you will think a great deal of her, and I want to bring her to Slater as soon as it will suit you for me to bring her.''

In the answer to this letter the grandmother said, in part: ''This is still Myrtle's home and her own dear parents and her own dear baby and her sweet memories, wishes and requests are still fresh in our hearts so do you think we could just now welcome Mary into our home as you, she or we would like to? No, not at present. We are not mad nor have any hard feelings toward her in the least, only would like for her to feel welcome, and I know she will think it best right now for she has a woman's heart. Want you to come when it suits you and whenever you want to see Lura Marie. Think it would be best for you to come alone this time and let us have a heart to heart talk and feel the happiness of us all will depend on you right now. We think Lura Marie's happiness and welfare is of the greatest importance now.''

In response to this letter the petitioner went alone to Slater and had an interview with respondents at their home. All were deeply affected and at times gave way to their emotions. From the petitioner's testimony it appears that the grandmother remembering her daughter had spoken against second marriages could not bear the thought of beholding another in her daughter's place

and said that she could not receive Mary at that time, but she evinced a resolution to control her feelings and expressed the hope that she would then receive Mary in a befitting manner. In the course of the conversation the petitioner states he said "possibly you are laboring under the impression that I am going to take Lura Marie but I talked this over with my wife before we were married and I told her that I was devoted to my child, thought the world and all of her and I would give anything in the world if I could have her with me, but I appreciated what Mr. and Mrs. Baker have done and I know that they are attached to the child and for that reason I have made up my mind that as long as they want to keep Lura Marie I am going to leave her with them."

The grandmother testified, in part, "I told him just to give me a little time until I could control my feelings and I felt it would all be well, that I would try, and he talked nicely to us with the kindest of feeling that he could sympathize with us and knew how it was—not an unkind word was said. . . . I said, 'Now, George, I shall never throw a straw in the way of your happiness and I want you to visit this baby just as often as you want to, you are just as welcome as you ever were in your life. . . . We will let the baby come to see you, there will be passings back and forth to Marshall—relatives and friends can take her—and soon she will be large enough to go home and she can stay as long as you want her or she wants to stay. You are welcome whenever you want to come and possibly in a short time I will be able to meet your wife as you would like me to and be pleasant, if I was weeping all the time it would be embarrassing to her."

It will be observed the parties substantially agree about that interview which ended in apparent concord and with the understanding that the child would be allowed to remain with her grandparents and that the petitioner's wife would be received in that home as soon as the grandmother could bring herself under control.

But a misunderstanding was to develop which culminated in this litigation. Slowly and by degrees the

petitioner reached the conviction that Mrs. Baker never would receive his wife in her home as a respected and welcome guest. On the other hand respondents became convinced that the petitioner was insisting upon his wife being received as their daughter.

We do not find it necessary to go into the details of the events which intervened between this interview we have related and the resort by petitioner to legal redress. Once, at the request of the petitioner, his partner and the president of the Missouri Valley College called upon respondents. The President testified: "I did all I could to make clear the importance of being hospitably inclined toward Mary for their sake and George's sake and the child's sake. So far as their attitude toward George was concerned, they stated they were glad to have him come any time as he always had, but that so far as Mary was concerned the death of Myrtle had been so grievous to them that they did not feel like welcoming anybody into the home that held the place that she held." Finally on June 27, 1914, petitioner wrote respondents a letter informing them that he had employed counsel and demanded the custody of his child and in September following he began proceedings in the circuit court of Saline county by *habeas corpus* to enforce his demand and a temporary order was made by Judge Davis which provided:

"That for the present and until further order herein, the home of the said infant child, Lura Marie Crockett, shall remain with her grandparents, the respondents, W. H. Baker and Lura Baker, and that the father of said child, petitioner, George R. Crockett and his wife, Mary Crockett, or either of them shall have the privilege of visiting her there at all times, and the said father shall have the right to have her visit him and his wife at their home when he thinks proper; and it is further ordered that when said child is making her home with her grandparents, she shall be taught to love and respect her father and his wife and when visiting the latter, that she shall inculcate love and respect in said grandchild for her grandparents, and neither party shall by word or act

estrange said child from the other and permit it to be done while said child shall be in their charge; and the good faith with which this order is complied with by the respective parties will be considered in determining any objection that may be made to a continuance of this temporary arrangement penaing the final hearing.

"It is further ordered that this shall only be taken as a temporary arrangemenü, pending hearing upon the merits, without in any manner prejudicing the rights of any of the parties, and is for the purpose of enabling the parties to make an amicable agreement in regard to said child."

This order was continued in force and the cause was continued until June 12, 1915, when it was dismissed by the petitioner and shortly thereafter the present suit was instituted. It will be noted that more than two years have passed since the subject of Mary's position with respondents became a matter of deep concern to the parties. During that time the petitioner frequently visited his child at respondent's home and the child visited the petitioner and his wife at Marshall, but she has never been allowed to remain over night. We find in the evidence no good ground for a belief that respondents failed to carry out the temporary order issued by Judge Davis in spirit as well as letter. Twice the petitioner and his wife called together at respondents' home and were courteously received. In their return to the writ respondents "most respectfully and most earnestly pray that they may be permitted and authorized to continue in the custody of said child and there being no other child in their home, they promise, if their prayer be granted to unreservedly give themselves, their time, their money to the proper rearing of said child, to faithfully teach it to love its father and step-mother and to permit them to visit it at their pleasure in the home of these respondents and to permit it to visit them according to their pleasure and as the health and well-being of the child may warrant."

And respondents in their testimony assert their willingness to carry out this solemn promise. Fortunately the parties through the entire course of the misunder-

standing have been singularly free from bitterness or rancor towards each other. No wounds have been made which will not quickly heal or prevent the restoration of complete trust and confidence. One cannot read the record without being impressed with the fact that the deeps of the affection between the petitioner and the respondents have not even been ruffled. We cannot speak too strongly in admiration of the respect and consideration they have displayed towards each other throughout this trying experience and of their candor and sincerity. And while we are bestowing praise the character and conduct of the second wife must not be overlooked. Her good sense, womanly understanding and tact will win the love of the child and its grandparents as it must already have secured their respect and admiration.

There is no danger of the child becoming alienated from her father if she continues to live with her grandparents whose love for her, reinforced by ample means and guided by a strong and intelligent sense of duty, will secure the realization of the ends of her true welfare. If taken from her grandparents and given to her father we fear the consequences would be highly injurious to her and to them. For eight years the child has known no other parental care than that lavished upon her by the grandparents, both of whom are in vigorous health and apparently far removed from the disabilities of old age. We do not perceive how the father wisely and humanely could have done otherwise than leave her with them, but the necessities of his situation compelled a course which resulted in the creation of a status between his child and her grandparents which could not be rudely destroyed without lasting injury to their frail, nervous, imaginative and strongly emotional little girl whose love for her grandparents is of pathetic intensity. The father's testimony, from which we have quoted, shows he understood and fully appreciated the situation and we give him the credit of refraining from attempting to dissolve such sacred ties until he felt that he must resort to that expedient, or resign his right of parentage or, worse still, be recreant to his duty to his wife. In this we think

he was mistaken, and we attribute the unfortunate situation which arose between him and respondents to his own impatience and failure to appreciate sentiments which stood in the way of his desire. He pressed his mother-in-law too hard and thereby led her to believe he was exacting of her the impossible thing of substituting Mary for Myrtle. Of course he entertained no such cruel purpose, but the result of what he did was the same.

The facts of the case may be reduced to this situation: The petitioner was willing from the first for his child to remain with respondents provided they opened their doors to his wife the same as to hm. Respondents are willing to do this and to accord to him and his wife the enjoyment of all parental rights consistent with the established status. The proper rearing and development of the child is assured if she remain with her grandparents but her peace of mind certainly, and her physical well-being probably, will be seriously affected if the status her father knowingly and willingly allowed to be created and firmly rooted should be destroyed. In such situation we do not hesitate in reaching the conclusion that the true welfare of the child, which is the primary consideration, will be best promoted by denying the writ.

This conclusion does not overlook or ignore the rule of universal acceptation that, as between the father and grandparents of an infant, the father, being the natural guardian of his child, is entitled to the custody of its person "unless it is made manifest to the court that the father, for some reason, is unfit or incompetent to take charge of it, or unless the welfare of the child itself, for some special or extraordinary reason, demands a different disposition of it at the hands of the court." [In the matter of Scarritt, 76 Mo. 565.]

As is aptly said in Weir v. Marley, 99 Mo. l. c. 494: "The law at the birth of an infant, imposes upon the parent the duty of such care and protection, to the performance of which the instincts of nature so readily prompts, and clothes him with the right of custody, that he may perform it effectually, upon the presumption that such custody, being in harmony with nature, is best for

the interest, not only of the parent and child, but also of society; conceding, however, that the primary object is the interest of the child, the presumption of the law is that its interest is to be in the custody of its parent.''

Such presumption is as strong as the natural instinct from which it arises, and always should be applied by the courts not in aid of any asserted right of custody, as though it were a legal right of property, but in furtherance of the true aim of normal parental care and affection which has regard only for the welfare of the child. It must be kept in mind that society as the supreme parent of all its children has a vital interest in every controversy of this character and its chief care which finds concrete expression in the pertinent juridicial policies and rules is to serve the welfare of the child. This thought was well expressed by Senator Paige in Mercein v. People, 25 Wendell, l. c. 103:

''It seems then, that by the law of nature, the father, has no paramount, inalienable right to the custody of his child. And the civil or municipal laws in setting bounds to his parental authority and in entirely or partially depriving him of it in cases where the interests and welfare of his child require it, does not come in conflict with or subvert any of the principles of the natural law. The moment a child is born, it owes allegiance to the government of the country of its birth, and is entitled to the protection of that government. And such government is obligated by its duty of protection, to consult the welfare, comfort and interests of such child in regulating its custody during the period of its minority.''

Judge TRIMBLE, in the recent case of Meredith v. Krauthoff, 191 Mo. App. 170, tersely summed up the judicial attitude in the sentence: ''While the rights of neither parent should be disregarded or overlooked yet the welfare of the child is superior to the claims of either parent.''

From these references to reported decisions the conclusion must be drawn that the initial presumption in favor of parental custody is referable and subservient to the paramount consideration of the interests and welfare

of the child and that the courts in dealing with such tender cases are not hampered or bound by mere presumptions. That an infant stands in need of the love and care of its natural parents whose place cannot be wholly supplied by ancestors of the preceding generation must be conceded, but the disadvantages to the child resulting from the absence of normal relations with its parents may be overbalanced by those which might follow the destruction of a deeply-rooted status created by its long-continued deprivation of normal, natural contact with its parents. Aside from considerations of the welfare of the child which, as stated, are supreme, the incidental rights of those who for many years have discharged all the duties of parentage are not to be wholly ignored or even subordinated to any claim of the natural parent who, either from indifference or necessity has failed to exercise his sacred privileges and suffered his child to grow into the attitude of regarding others as its natural benefactors.

One of the most eminent jurists of modern times (Judge BREWER) said in Chapsky v. Wood, 26 Kans. 650: ". . . ties of blood weaken and ties of companionship strengthen, by lapse of time and the prosperity and welfare of the child depends on the number and strength of these ties, as well as on the ability to do all which the promptings of these ties compel." And further, "The right of the father must be considered; the right of the one who has filled the parental place for years should be considered. Perhaps it may not be technically correct to speak of that as a right; and yet they who for years filled the place of the parent, have discharged all the obligations of care and support, and especially when they have discharged these duties during those years of infancy when the burden is especially heavy, when the labor and care are of a kind whose value cannot be expressed in money. When all these labors have been performed and the child has bloomed into bright and happy girlhood, it is but fair and proper that their previous faithfulness, and the interest and affection which these labors have created in them should be respected. Above

195 M. A.—5

all things the paramount consideration is what will promote the welfare of the child?''

The dying mother of Lura Marie, with true maternal prescience, *knew* that the welfare of her baby demanded the loving maternal care of her mother and when she passed away all who joined in the sorrowful family council, including the father of the child, were of the same opinion. His opinion was unchanged, so he states, when he courted and married his second wife and afterward when the subject of her position in the family group became a matter of discussion and negotiation. He has never ''fathered'' his child, and while she has been taught to love and honor him as her father, she naturally looks to, and leans upon, her grandparents as her natural guardians and benefactors. They are not to blame for this situation, neither is the father who was driven by necessity to renounce the privileges and joys of real fatherhood until his child had become bound by ties which now to dissever would not only injure her physically but strike at the very foundation of her developing moral and spiritual being.

What has occurred to change the conviction of the petitioner that respondents' home and not his own would be the best culture ground for his child? Nothing, except his displeasure over the attitude of the grandmother towards his wife. It is not necessary to discuss whether or not he should imperil the interests and happiness of his child for such a cause since the cause itself has been removed. We accept at par the solemn assurance of respondents that they will welcome and treat Mary as an honored and worthy member of the family circle and will recognize and satisfy every reasonable parental right of the petitioner and his wife. If these assurances were not made in all sincerity, or if respondents should fail to observe their binding force, and should disappoint our confident expectations, we will know how to deal with them. As the case stands we hold that the welfare of the child requires the continuation of respondents' custody of her. The peremptory writ is denied and the infant is remanded to the custody of respondents.

*Trimble, J.,* concurs; *Ellison, P. J.,* dissents in separate opinion.

## DISSENTING OPINION.

ELLISON, P. J.—After our writ of *habeas corpus* was served and return was made, the parties agreed upon T. H. Harvey, Esq., of the Saline county bar as special commissioner to take the testimony. We appointed him with directions to make return of the evidence and his conclusions to the court. Mr. Harvey heard the evidence and, after thoroughly considering it and the law applicable thereto, reported that he found the father was a fit and competent person to take charge of his child; that it would be for her best interest and welfare that she be given into his custody; and that no good reason had been shown to exist why that should not be done.

His report shows he has given the case, in all its bearings, careful consideration. He has set out reasons for his conclusions which appear to me to be borne out by the evidence.

Each of the parties concede that the best interest of the child should control the action of the court in disposing of its custody. The record shows, and it is conceded, that the character of each is the very highest and that the best moral atmosphere, ideals and example would surround the child at the home of either; and the evidence shows, without dispute, that Mr. Crockett's present wife is a refined and an intelligent woman, even tempered, kind and gentle. They have no children and nothing appears to cause a thought that she would not be attentive, watchful and loving. The evidence further shows that each of the parties is financially able to provide for the child and properly educate her; though it does appear from the evidence that the grandfather is a man of much larger means than the father. This, evidently, was brought out to show that it was for the best interest of the child and her welfare that she be given into the custody of the grandparents. It would be stretching the meaning of law intended to be beneficent, to such length

as to destroy its character, if we are to say that the best interest of a child lies with the custodian who has the most money. There are some grandparents, or other kinsmen, in this country who could provide extraordinary luxuries for children at enormous cost, and it would be a cruel prospect for an affectionate father who found himself out stript in such measurement of material benefits. Manifestly, the legal expression, ''best interests of the child,'' was never intended to penalize a parent for living a simple life, so long as he was an honest and respectable man with disposition and capacity to maintain and educate his child.

This being the situation and these the circumstances, I am led to ask, What stands in the way of the father? Why should a good, affectionate and capable father be deprived of the custody and care of his child? Certainly not the law of nature, and neither does the law of the land. The truth is, the record shows that nothing is in the way save the tender impulse and sentiment of the grandmother for *her* child who came to an untimely death. So far did she allow this love of the memory of her daughter to control her actions that she treated Mrs. Crockett with li' le respect and scant politeness. It so far blinded her to Mr. Crockett's rights that, though the father, he was not accorded much more privilege and association with his child than if he had been a mere acquaintance. The constant efforts he made and the different disappointments he had in seeing her, together with the slight and trivial excuses offered, make up several sad pages in the record.

I think the commissioner's report should be approved and the proper judgment entered upon it.